UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH DEAN VIGIL,

        Plaintiff,

v.                                          Case No. 10-14401
                                            Honorable Patrick J. Duggan

REGENTS OF THE UNIVERSITY OF
MICHIGAN, EDIE GOLDENBERG,
DON HERZOG, CHRISTINA WHITMAN,
and ANNA KIRKLAND,

        Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This lawsuit arises from Plaintiff's dismissal from the University of Michigan's doctoral program in November 2007, after he failed to complete his dissertation within six years of becoming a candidate. The matter presently is before the Court on Defendants' motion for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56 on August 1, 2013. The motion has been fully briefed and, on September 13, 2013, this Court issued a notice informing the parties that it is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1. For the reasons that follow, the Court now grants Defendants' motion.

# I.      Procedural Background

Plaintiff initiated this lawsuit on November 3, 2010, by filing a *pro se* complaint against the Regents of the University of Michigan ("Regents") and Drs. Edie Goldenberg ("Dr. Goldenberg"), Donald Herzog ("Dr. Herzog"), Christina Whitman ("Dr. Whitman"), and Anna Kirkland ("Dr. Kirkland"). Dr. Goldenberg is the Director of Graduate Studies in the Political Science Department at the University of Michigan ("UofM") and Drs. Herzog, Whitman, and Kirkland are UofM faculty members.

Plaintiff is suing the individual defendants in their personal and official capacities.  He asserts the following claims against all Defendants: (1) retaliation in violation of his First Amendment rights under 42 U.S.C. § 1983; (2) violation of his substantive and procedural due process rights under § 1983; (3) violation of his rights under the Equal Protection Clause pursuant to § 1983; (4) retaliation in violation of his free speech rights under the Michigan Constitution; (5) violation of his due process rights under the Michigan Constitution; (6) violation of his equal protection rights under the Michigan Constitution; (7) breach of express or implied contract; (8) defamation; (9) tortious interference with contractual or advantageous business relationships; (10) intentional infliction of emotional distress; and (11) race and ethnic discrimination in violation of Michigan's Elliott-Larsen Civil

Rights Act.

On March 25, 2011, Defendants filed a motion to dismiss in which they asserted several reasons why they believed Plaintiff's Complaint fails to state a claim upon which relief may be granted. The Court granted Defendants' motion in an opinion and order filed July 28, 2011, focusing primarily on Defendants' statute of limitations defense. (ECF No. 23.) The Court concluded that all but Plaintiff's breach of contract claims are time-barred under the applicable statutes of limitations and should be dismissed with prejudice. The Court also found that Plaintiff failed to assert any specific allegations of defamatory conduct to state a defamation claim. Although timely asserted, the Court declined to exercise supplemental jurisdiction over Plaintiff's breach of contract claim and dismissed that claim without prejudice. Plaintiff filed an appeal and the Sixth Circuit Court of Appeals affirmed in part and reversed in part. *Vigil v. Regents of the Univ. of Michigan*, No. 11-2075 (6th Cir. Dec. 6, 2012) (unpublished op.).

The appellate court affirmed the Court's dismissal of Plaintiff's claims to the extent they are based on Defendants' alleged failure to provide Plaintiff with sufficient academic support to complete the doctoral program. The court however held that Plaintiff's claims, to the extent they are based on his dismissal from the program, are not time-barred. Thus the panel remanded the matter to this Court

3

"for further proceedings on [Plaintiff's] remaining claims regarding the alleged breach of contract and his dismissal from the program in 2007."  *Id*. at 4.

Following the Sixth Circuit's mandate, Defendants filed the pending motion for summary judgment.

## II.    Summary Judgment Standard

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id.* at 323, 106 S. Ct. at 2553.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Electric Indus. Co. v. Zenith Radio*

4

*Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255, 106 S. Ct. at 2513.

## III.   Factual Background

Plaintiff was accepted for graduate study in UofM's Political Science Department beginning the Fall 1991 term. He achieved doctoral candidacy status in September 2001. At that stage, a doctoral candidate must plan, execute, and successfully defend his or her dissertation. (Pl.'s Aff. [ECF No. 43], Ex 12.)

UofM's graduate school provides guidelines for dissertations. According to those guidelines, a dissertation committee is generally comprised of four

5

individuals satisfying specific eligibility requirements.  The graduate student is responsible for forming his or her dissertation committee.  (*See id*., Exs. 12, 13.)

Plaintiff did not form his first dissertation committee until September 2003. (Defs.' Mot. Ex. D at 3.)  The committee consisted of Dr. Herzog as chair, Dr. Whitman, Dr. Jonathan Simon, and Dr. Noga Morrag-Levine.  (*Id*.)  In an e-mail dated February 26, 2004, Dr. Herzog advised Plaintiff (apparently in response to the latter's request to schedule a defense of his dissertation):

> hi Joe:
>
> let's go ahead and schedule a defense – i certainly don't want to stand in the way of your getting a job.  but i'd like to be crystal clear with you – every member of the committee has serious reservations about the acceptability of the work you've submitted and some of us have grave reservations.  at best we will require you to make serious revisions before depositing the thesis and earning your degree.  at worst, i'm afraid it's possible that we might decide the thesis is too far away from an acceptable product for the defense to count as a success; that is we might end up telling you that you simply can't earn a PhD with this writing.
>
> in the meantime, i understand why your research sources might want confidentiality.  but you do have to tell us where you did this research. could you please let me know?
>
> best,
>
> don

(Defs.' Mot. Ex. E.)  The e-mail was copied to the other members of Plaintiff's dissertation committee.  (*Id*.)  Between this communication and Fall 2004, Dr.

6

Morag-Levine left UofM and withdrew as a member of Plaintiff's dissertation

committee.  (*See* Pl.'s Aff. ¶ 18, Ex. 9 at 2.)

In a September 3, 2004 e-mail, Dr. Herzog summarized the status of

Plaintiff's dissertation for Lili Kivisto (a staff member in UofM's Department of

Political Science) and June Howard (at the time a UofM faculty member):

> i'm just back from a trip to ohio state.
>
> for quite some time now i have been telling Joe he needs to schedule a
> defense and circulate a complete copy of his dissertation to all
> members of the committee.  as i'd told him before, there are grave
> doubts about what he's done.  i know we ordinarily schedule a
> defense when things are more or less ready to go, but this committee–
> whoever is going to be on it– has never had a joint meeting or
> discussion; and obviously time is of the essence.
>
> Joe has not done that.  i'm not sure why, though he did tell me he was
> scared that we could "shoot down" whatever he accomplished.
> instead he has occasionally emailed people overviews and defenses of
> what he thinks the dissertation draft accomplishes.
>
> he wants (me) to petition Rackham to let him have a 3-person
> committee, which would be me, Chris Whitman, and Jonathan Simon.
> i still have title and voting rights in political science, though i'm full-
> time at the law school; Chris is at the law school; Jonathan taught in
> political science here but left many years ago and is now at Boalt,
> Berkeley's law school.  i can't say that i see any particularly good
> reason for him to waive the usual requirements about committee
> membership.
>
> don

(Pl.'s Aff., Ex. 9 at 1.)  In response to an e-mail from Dr. Goldenberg on

September 7, 2004, inquiring about the status of Plaintiff's dissertation and

suggesting possible professors to serve as the fourth member of his dissertation

committee, Dr. Herzog wrote:

> hi Edie:
>
> Joe has a complete draft of a very odd and quite weak dissertation.  he
> wanted to write on the pornography debate.  he spent some time
> interviewing sex workers in ypsilanti sex clubs (after telling me for
> years that he was working in one of the leading porn film studios - i
> never got a straight answer to him about that and alas i suspect he was
> simply lying, since it took him forever to tell me that the "data" was
> from ypsi).  he discovered they're in it for the money, which he thinks
> is a new finding.  and he thinks that legally it means it's easier to
> regulate pornography qua commercial speech.  this flatly
> misunderstands the way constitutional law treats the category
> commercial speech.  i have pointed out to him that the new york times
> is sold for money too, but the first amendment protects it, even if
> arthur rosenthal and the rest of them don't care about contributing to
> democratic debate &c.
>
> he has had a very hard time with his health– cancer of the tongue, i
> think.  he is also kind of crazy.  i have told him that i'd like him to get
> together a committee so we can jointly talk about what he's done,
> since i have grave reservations about whether it is acceptable as a
> PhD, and so does at least Chris Whitman.  i think Jonathan is of a
> view not uncommon in our dept, that stamina and two or three
> hundred pages warrant a PhD no matter what the quality is.  but
> Jonathan agrees the work is just a mess.
>
> i've repeatedly asked Joe to get a committee together and have
> renewed the request since Noga dropped out.  instead he has emailed
> brief accounts of what he thinks the dissertation accomplishes.  i've
> asked him to send the members a current version of the draft; he
> hasn't done that.  i wish frankly that i had washed my hands of him
> years ago, after his surreal prelim.  i won't do that now, but i also will

not simply sign off on whatever he submits on the grounds that it's the
path of least resistance, that it isn't a license to practice surgery, that
he's come this far, &c &c.

i guess Jennet or Marvin would be fine . . . the best bet substantively
would be Anna Kirkland, who does feminism and law; she's primarily
in women's studies but memory claims we did vote her an appt of
some kind in poli sci.  i don't want to impose on anyone to do it
because it will be weird and thankless work.

sorry that this has to cross your desk.

don

(*Id.* at 3.)

Plaintiff and Dr. Herzog engaged in a series of communications in
September 2004 that reflect Plaintiff's attempts to complete his dissertation with
only a three-person committee, belief that his work had "passed the evaluation of
two committee people,"[1] and lack of understanding as to what Dr. Herzog thought
Plaintiff needed to do to complete his dissertation.  (*See id.* at 3-9.)  In these
communications, Dr. Herzog conveyed to Plaintiff that he needed to convene a
regular (i.e., four-person) dissertation committee, circulate a current draft of his
work, and schedule a defense.  (*Id.*)  Eventually, in January 2005, Plaintiff secured
Dr. Kirkland as the fourth member of his dissertation committee.  (Defs.' Mot. Ex.

---

[1]It appears from other communications that Plaintiff is referring to Dr.
Simon and William Beaney (a professor in Denver where Plaintiff was teaching,
who had since passed away).

9

D at 4.)

On February 3, 2005, Dr. Herzog sent an e-mail to the committee members, asking that they read Plaintiff's work "in the next week or two" and then confer "about what he needs to do to earn the PhD– or whether the thing is salvageable at all." (Pl.'s Aff., Ex. 9 at 10.)  The following day, Dr. Simon wrote Dr. Herzog:

> Don, I'm taking his chapters home this weekend.  The only one I could open before was the introduction which was not promising but I'm steeled to read the rest to see if we can possibly justify this.  I've warned him that I can't send any letters out for him until we have a decision on his prospects for getting the PHD.  I'm ready to put a pretty heavy thumb on the scale for a combination of years invested and our folly for not cou[n]seling him out years ago (or being too subtle in doing such) but I'm not sure it will be enough.

(*Id*.)  Dr. Whitman wrote to Dr. Herzog: "My (extremely negative) view is unchanged."  (*Id*. at 10.)

In or around April 2005, Dr. Herzog informed Plaintiff that "no one on the committee thinks this draft [of his dissertation] is defensible, and no one sees any plausible revising strategies for turning it into a defensible draft."  (*Id*. at 11.)  Dr. Herzog indicated that he was seeking comments from the dissertation committee members that he would send to Plaintiff, along with his own.  (*Id*.)  Dr. Herzog summarized those comments in a May 13, 2005 e-mail to Plaintiff.  (*Id*. at 11-13.)

Plaintiff subsequently submitted planned revisions to his dissertation, in response to which Dr. Herzog resigned from the committee.  (*Id*. at 13-14; Defs.'

Mot. Ex. F at 3.)  In a November 3, 2005 e-mail to Plaintiff, Dr. Herzog explained that he viewed Plaintiff's position as "a complete nonstarter on first amendment grounds.  i don't mean, 'all things considered i probably disagree, but your position is reasonable.'  i mean, 'as i see the law, your position is wrong, period.'" (*Id.*)  He explained further:

> i don't want to stand in the way of your completing the degree, and alas i'm convinced there is no version of this project i will be able to certify meets the standards for a PhD. . . . i don't want the signal to you or to the department to be that this project is now dead.  if you can find a replacement committee member who views the project less favorably than i do, that's fine by me. . . .

(*Id.* at 14.)

Plaintiff sent an e-mail to Dr. Kirkland on November 27, 2005, seeking to gain her support and asking her to replace Dr. Herzog as the committee chair.  (*Id.*)  In a response e-mail dated December 17, 2005, Dr. Kirkland declined and also withdrew from the committee.  (Pl.'s Aff., Ex. 10; Defs.' Mot. Ex. F at 4.)  Dr. Kirkland wrote, in part:

> I have shared the concerns that Don [Herzog] raised to you since I first read your dissertation.  After giving it some more thought and re-reading the work, I have to say that I can't serve as your chair because I can't be sufficiently supportive. . . . The basic research question, design, execution, and conclusions of the work are flawed.  This doesn't represent the Ph.D.-level standard for qualitative interview research, legal theorizing about the First Amendment, or political science study of the pornography debates.  It doesn't fairly represent or engage with the scholarly debates within these fields and as a

11

consequence doesn't offer an intellectual intervention that makes
sense.

(*Id*.)

Plaintiff sent an e-mail to Dr. Whitman on February 22, 2006, attempting to
garner her support for his dissertation.  (Defs.' Mot. Ex F at 5-7.)  In this
communication, Plaintiff threatened litigation, blamed others for his failure to
complete the dissertation process, and expressed suspicion that there was some
"behind-the scenes" attempt to sabotage him.  (*Id*.)  In a response e-mail, Dr.
Whitman wrote in part:

> Joe–
>
> I thought I had communicated (to you and to Don) that I had such
> serious problems with virtually every aspect of the thesis (the
> substitution for opinion for argument, the rigor of the research
> methodology, the accuracy of the description of positions held by
> others, etc.) that I thought the thesis had to be totally reconceived[] – a
> project that I considered your responsibility rather than mine.  I
> understood that this was a view shared by most of the other members
> of the committee, and I was told that the Chair would communicate
> (and had communicated) with you about the problems.  The reason for
> letting the Chair take the lead on this is that we all saw the same
> problems and the issues were so extensive – as I told you, my basic
> problem is that I did not see that you had made arguments at all, but
> simply expressed your unsupported opinions.  That is a problem that
> more citations and academic terminology does not cure. . . .
>
> If you have a new Chair, and he believes that the thesis is now in a
> shape where it would be helpful to get reactions from members of the
> committee, I will turn my attention to it one more time.  Do you have
> a more recent draft since you have begun working with Professor

> Nagel?  I am delighted that he has agreed to do this because he is
> indeed a superb First Amendment scholar and your articulation of
> your project as it has evolved (including the description below [in
> Plaintiff's e-mail to her]) simply makes no sense to me.  It is difficult
> to give feedback in that context.  I would really benefit from his help.

(*Id*. at 5.)

By March 28, 2006, Dr. Simon remained willing to serve on Plaintiff's

dissertation committee; although he shared the views of the committee led by Dr.

Herzog that Plaintiff's dissertation was not ready for a defense and that his

empirical research was problematic.  (*See* Defs.' Mot. Ex. F at 8.)  According to

Dr. Simon, he had shared his views with Plaintiff "for years."  (*Id*.)

Thereafter, Plaintiff failed to convene a new committee or find a new

committee chair.  (Defs.' Mot. Ex. G at 96-100.)

Meanwhile, in December 2000, Dr. Goldenberg had issued a memorandum

to all graduate school students informing them of new time requirements for degree

completion approved by the Department of Political Science at its December 14,

2000 meeting.  (*See* Defs.' Mot. Ex. C.)  According to these requirements, "any

student who takes more than six years post-candidacy to complete the dissertation

and the Ph.D. . . . will be required to retake the preliminary examination in the

major field before receiving a Ph.D."  (*Id*.)  Plaintiff claims that he was never

notified of this new requirement.[2]  (Pl.'s Aff. ¶ 23.)

Relying on this requirement, on or about November 6, 2007, Dr. Goldenberg sent a letter to Plaintiff notifying him that he was being placed on inactive status because he failed to successfully defend his dissertation by September 2007 (that being six years after he achieved doctoral candidacy status).  (Defs.' Mot. Ex. B.) Plaintiff did not grieve this decision pursuant to the graduate school's grievance procedures, although Dr. Goldenberg in a March 30, 2006 e-mail referred Plaintiff to someone in the graduate school if he was interested in doing so.  (*Id*. Ex. G at 124; Ex. P.)

Plaintiff claims that he lost the opportunity for a tenure track position at the University of Louisville in Kentucky (where he was a visiting instructor of political science from 2006 to 2007) because he did not complete his dissertation and obtain his Ph.D.  (Pl.'s Aff. ¶ 25.)

## IV.    Defendants' Arguments and Plaintiff's Response

Defendants raise several arguments in support of their summary judgment motion.  They summarize those arguments as follows:

I.    Plaintiff's claims against [the] individual defendants Herzog,

_____

[2]Plaintiff alleges in his unsworn Complaint that Dr. Simon advised him that no time constraint existed for completing the Ph.D.  (*See* Compl. ¶ 81.)  He has presented no admissible evidence to support this assertion, however.

14

Whitman and Kirkland must be dismissed because they were
not involved in the dismissal decision.

II.     Plaintiff's claims are barred by the Eleventh Amendment.

III.    Plaintiff's claims against the individual defendants are barred
by the doctrine of qualified immunity [as applied to § 1983 and
under the Michigan Governmental Immunity Act].

IV.     Plaintiff has failed to identify a constitutionally protected
interest that triggers any substantive or procedural due process
protection [or, as to the latter, he received whatever process was
due].

V.      UofM may not be held liable under agency theories for the
alleged unconstitutional or intentional acts of its faculty.

VI.     Plaintiff has no evidence to support the state tort and race
discrimination claims against Dr. Goldenberg.

VII.    Plaintiff may not recover on his breach of contract claim, as a
matter of law.

In response, Plaintiff contends that he was never made aware of the

requirement that he defend his dissertation within six years.  Plaintiff claims that if

he had been put on notice of this requirement, he could have pushed his

dissertation committee to provide feedback earlier so he would have had time to

make necessary revisions to the dissertation and schedule a defense.  Plaintiff

argues that Drs. Herzog, Whitman, and Kirkland are liable for his dismissal

because, he further argues, they are responsible for failing "to function as a

dissertation committee and to schedule the draft thesis for defense on a preliminary

15

basis within nine months of [Plaintiff] being admitted to candidacy."  (Pl.'s Resp.

Br. at 6.)

As to Defendants' Eleventh Amendment immunity defense, Plaintiff argues

that the amendment does not bar his request for prospective relief– that being an

order restoring him to the Ph.D. program at UofM and for the reconvening of a

dissertation committee to work with him on his thesis.  Plaintiff argues that

Defendants are not entitled to qualified immunity on his § 1983 claims because

"political science and law professors specializing in American government and

public law, should have known that Michigan state law recognizes a property right

in continued enrollment that is protected under the due process clause of the

Fourteenth Amendment."  (*Id*. at 7.)  Plaintiff also contends that "Dr. Herzog's

willful refusal to function as an advisor to [Plaintiff] about the thesis after he had

agreed to accept that role amounts to plain incompetence in violation of the

constitutional standard articulated in *Hunter [v. Bryant*, 502 U.S. 224 (1991)]."

(*Id*.)

Plaintiff argues that Dr. Goldenberg is not entitled to immunity under the

Michigan Governmental Immunity Act because her conduct amounted to gross

negligence.  (Pl.'s Resp. Br. at 7-8.)

With respect to his due process claims, Plaintiff argues that Michigan state

16

courts recognize a property right in continued enrollment in a university and thus

he was entitled to protection from arbitrary dismissal from UofM and certain

procedural protections before he was dismissed.  He contends that Defendants

failed to provide these protections.  Plaintiff further contends that Defendants

violated his substantive due process rights in that their conducted amount to such a

"'substantial departure from accepted academic norms so as to demonstrate that the

person or committee did not actually exercise professional judgment.'" (Pl.'s Resp.

Br. at 9, quoting *Bd. of Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214,

224 (1985).)  Plaintiff points to "[t]he [alleged] failure of the committee to guide

[his] doctoral research, to schedule a preliminary defense of his abstract to

facilitate that guidance, to supervise the preparation of the abstract, and then to

dismiss [Plaintiff] based upon a six year completion standard not intended to apply

to him in the first place . . .."  (*Id*. at 10.)

Lastly, Plaintiff argues that his breach of contract claims are supported by

the evidence submitted.  Specifically, he claims that the Department of Political

Science's General Guidelines for the Doctoral Program in Political Science

("General Guidelines") constitute an express and enforceable contract that

Defendants breached.  (*Id*.)  He also argues that he had an implied contractual right

to continued enrollment free from arbitrary dismissal.  (*Id*. at 10-11.)  For the

17

reasons set forth as to his procedural due process claim, he contends he was
arbitrarily dismissed.

Defendants point out in reply that Plaintiff did not address several of their
arguments in his response to their motion. They therefore argue that Plaintiff
should be deemed to have waived some of his claims. Specifically, Plaintiff did
not address Defendants' arguments that UofM cannot be held liable for the
unconstitutional acts or intentional misconduct of its faculty and that Plaintiff
failed to state facts supporting his tortious interference, intentional infliction of
emotional distress, and state law discrimination claims.

## V.    Abandoned Claims

Under Sixth Circuit precedent, "the failure to present any evidence to
counter a well-supported motion for summary judgment alone is grounds for
granting the motion." *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009).
Plaintiff's sworn affidavit, submitted in response to Defendants' motion, fails to
assert facts suggesting that Defendants intentionally interfered with a contract or
advantageous business relationship between Plaintiff and the University of
Louisville, engaged in "extreme and outrageous conduct" and/or conduct that
caused him "severe emotional distress," or dismissed him on account of his race or
ethnicity. The exhibits attached to Plaintiff's affidavit do not offer evidence

18

supporting the elements of these claims either.[3]  Plaintiff also fails to present

evidence from which a reasonable juror could find the Regents liable for the

alleged violations of his state and federal constitutional rights.  *See Monell v. Dep't*

*of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036 (1978) (rejecting

*respondeat superior* as a basis for imposing § 1983 liability); *Carlton v. Dep't of*

*Corr.*, 215 Mich. App. 490, 505, 546 NW2d 671, 678 (1996) (quoting *Smith v.*

*Dep't of Public Health*, 428 Mich. 540, 544, 410 N.W.2d 749 (1987)) ("[T]he state

will be liable for a violation of the state constitution only 'in cases where a state

'custom or policy' mandated the official or employee's actions.'").

For these reasons, the Court finds it unnecessary to address further

Plaintiff's claims against the Regents with respect to Counts 1-6 of his Complaint

or his claims against all defendants alleging tortious interference (Count 9),

intentional infliction of emotional distress (Count 10), and race discrimination

(Count 11).[4]  Those claims will be dismissed with prejudice.[5]

---

[3]The Court also carefully reviewed Plaintiff's testimony during his
deposition in this litigation.  (*See* Defs.' Mot. Ex. G.)  There, Plaintiff failed to
present any factual basis to support these claims.

[4]As to the Regents, the Court also would find that Plaintiff's § 1983 claims
are barred because this state instrumentality is not a "person" under the statute.
*See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71, 109 S. Ct. 2304, 2312
(1989); *see also Lapides v. Bd. of Regents of the Univ. of Georgia*, 535 U.S. 613,

(continued...)

19

## VI.    Applicable Law and Analysis

### A.    Plaintiff's Claims Against Drs. Herzog, Whitman, and Kirkland

This Court and the Sixth Circuit Court of Appeals have held that Plaintiff's claims based on Defendants' alleged failure to provide him with sufficient academic support and to schedule a defense of his dissertation are time-barred.  As such, the case is now about the decision to dismiss Plaintiff from UofM's graduate program, only.  Plaintiff sets forth neither facts nor even allegations suggesting that anyone but Dr. Goldenberg is responsible for this decision.

Plaintiff contends that the remaining individual defendants' failure to provide early feedback on his draft dissertation and to schedule a defense caused him to not complete his dissertation within six years of achieving candidacy and therefore supports their liability.  Even if such a theory– resembling the "cat's paw" theory in the employment discrimination context– could be raised here, the Court believes that it fails on the facts presented.  The evidence submitted

---

[4](...continued)
617, 122 S. Ct. 1640, 1643 (2002).  Eleventh Amendment immunity also bars Plaintiff from suing this state instrumentality under state law in federal court. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 S. Ct. 900.

[5]As the Court is dismissing Plaintiff's state law tort claims on this basis, it will not reach Defendants' arguments based on the Michigan Governmental Immunity Act.

20

demonstrates that Plaintiff alone bears the responsibility for not completing his

dissertation within six years of achieving candidacy.

The General Guidelines reflect that it is the candidate's responsibility to

plan, execute, and defend his or her dissertation and to establish an acceptable

dissertation committee.  Plaintiff did not form his initial committee until two years

after he achieved candidacy; and, when that committee fell apart, he was unable to

form a second committee with almost two years remaining before the six years'

deadline.  Plaintiff failed to complete a dissertation that a committee believed was

worthy of a defense.  The evidence strongly suggests that Plaintiff in fact received

early negative feedback concerning his draft dissertation but failed to acknowledge

and/or accept that feedback.

Accordingly, the Court concludes that summary judgment should be granted

to Drs. Herzog, Whitman, and Kirkland.

### B.      The Eleventh Amendment

As set forth previously in Section IV, Defendants seek summary judgment

based *inter alia* on sovereign immunity under the Eleventh Amendment and their

argument that Plaintiff fails to present facts to support the merits of his claims.

The Eleventh Amendment to the United States Constitution bars "any suit in law or

equity, commenced or prosecuted against one of the United States."  U.S. Const.

amend. XI.  "The ultimate guarantee of the Eleventh Amendment is that

nonconsenting States may not be sued by private individuals in federal court."  *Bd.*

*of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363, 121 S. Ct. 955, 962

(2001).  Eleventh Amendment immunity, however, does not shield all of the

defendants from all of Plaintiff's claims.[6]  And to the extent Eleventh Amendment

immunity applies, it only demands the dismissal of Plaintiff's claim *without*

prejudice. Sovereign immunity does not bar Plaintiff from turning around and

raising the claim against the State in state court.  *Hess v. Port Auth. Trans-Hudson*

*Corp.*, 513 U.S. 30, 39, 115 S. Ct. 394, 400 (1994) ("The Eleventh Amendment

largely shields States from suit in federal court without their consent, leaving

parties with claims against a State to present them, if the State permits, in the

State's own tribunals.").

    The Supreme Court has stated that the "[Eleventh] Amendment is

---

[6]"The [Eleventh A]mendment . . . bars suits for monetary relief against state officials sued in their official capacity." *Thiokol Corp. v. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir. 1993). However, under the doctrine set forth in *Ex Parte Young*, 209 U.S. 123, 28 S. Ct. 441 (1908), Eleventh Amendment immunity does not shield state officials sued in their official capacities for violations of federal law from claims for injunctive relief.  Plaintiff is seeking prospective relief. Additionally, the amendment does not prevent state officials from being sued in their personal capacity.  *See Foulks v. Ohio Dep't of Rehab. & Corr.*, 713 F.2d 1229, 1233 (6th Cir. 1983) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 237-38, 94 S. Ct. 1683 (1974)).

jurisdictional in the sense that it is a limitation on the federal court's judicial power." *Calderon v. Ashmus*, 523 U.S. 740, 745 n.2, 118 S. Ct. 1694, 1697 n.2 (1998). On the other hand, the Court also has "recognized that [the Eleventh Amendment] is not co-extensive with the limitations on judicial power in Article III. *Id.* Consistent with these principles, the Sixth Circuit has held that, where the defendants raise sovereign immunity as an "alternative" defense (rather than as a "threshold defense"), "the federal courts have discretion to address the sovereign-immunity defense and the merits in whichever order they prefer." *Nair v. Oakland Cmty. Mental Health Agency*, 443 F.3d 469, 477 (6th Cir. 2006).

Because the Court cannot settle any of Plaintiff's claims completely based on Defendants' sovereign immunity defense, and because the merits offer a straightforward way of resolving the case as a whole, the Court is electing to bypass the Eleventh Amendment question.

### C.     Plaintiff's § 1983 Claims[7]

---

[7]As set forth in Section IV, Defendants seek qualified immunity with respect to Plaintiff's § 1983 claims. Where the facts alleged establish an official's violation of the plaintiff's constitutional rights, this doctrine shields the official from immunity if the rights were not "clearly established" at the time of the injury. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001), overruled on other grounds by *Pearson*, 555 U.S. at 236, 129 S. Ct. at 818. This Court concludes that Defendants did not violate Plaintiff's constitutional rights. *See infra*. Therefore, it will not address whether the rights allegedly violated were

(continued...)

### 1.    Procedural Due Process[8]

The Fourteenth Amendment forbids a state from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To establish a procedural due process violation, a plaintiff must demonstrate that he possessed and was deprived of a constitutionally protected property or liberty interest and that the state did not afford adequate procedural rights prior to the deprivation.  *See, e.g., Taylor Acquisitions, LLC v. City of Taylor*, 313 F. App'x 826, 830 (6th Cir. 2009) (citing *Club Italia Soccer & Sports Org. v. Charter Twp. of Shelby*, 470 F.3d 286, 296 (6th Cir.2006) and *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir.2006)). "Property interests are not defined by the Constitution." *Taylor Acquisitions*, 313 F. App'x at 830 (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972)). "Rather, they are created

---

[7](...continued)
clearly established.

[8]The Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 1, § 17, of the Michigan Constitution both guarantee that no state shall deprive any person of "life, liberty, or property, without due process of law."  Michigan courts have held that where the federal and state constitutions contain identical or virtually identical provisions, federal law should be followed. *See Beck v. Haik*, No. 99-1050, 2000 WL 1597942, at *3 n.2 (6th Cir. Oct. 17, 2000) (citing *People v. Stanaway*, 446 Mich. 643, 649 n.1, 521 N.W.2d 557 (1994); *Sitz v. State Police*, 443 Mich. 744, 763, 506 N.W.2d 209 (1993)). Therefore, Plaintiff's state law due process claim survives only if his federal claim does.

and defined by 'existing rules or understandings that stem from an independent source such as state law.' " *Id*.

The Court finds it unnecessary to analyze prior case law and precedent to decide whether Plaintiff possessed a property right in his continued enrollment in UofM's graduate program. The parties disagree on this point and panels of the Sixth Circuit appear to do so as well. *Compare McGee v. Schoolcraft Cmty. Coll.*, 167 F. App'x 429, 437 (6th Cir. 2006) ("The issue of whether a student's interest in continued enrollment at a post-secondary institution is protected by procedural due process has not been resolved") *with Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005) ("In this Circuit, we have held that the Due Process Clause is implicated by higher education disciplinary decisions."). Even if the Court assumes that Plaintiff possessed such a right, the record evidence reflects no genuine issue of material fact as to whether he received whatever process was due. Plaintiff was informed of his committee's dissatisfaction with his dissertation draft and belief that it was not defense-ready. Further, Dr. Goldenberg's decision to dismiss Plaintiff was "careful and deliberate" based on the committee members' comments and the graduate school's requirement that candidates complete their

25

dissertation within six years of achieving candidacy.[9]  *Ku v. Tennessee*, 322 F.3d

431, 436 (6th Cir.2003) (providing that "when the student has been fully informed

of the faculty's dissatisfaction with the student's academic progress and when the

decision to dismiss was careful and deliberate, the Fourteenth Amendment's

procedural due process requirement has been met"); *see also Bd. of Curators of*

*Univ. of Missouri v. Horowitz*, 435 U.S. 78, 85, 89-91, 98 S. Ct. 948, 952-55

(1978) (holding that, when dismissing a student for academic reasons, a university

need not hold a hearing and meets the requirements of procedural due process so

long as the dismissal decision is "careful and deliberate").

### 2.    Substantive Due Process

In the second count of his Complaint, Plaintiff alleges a substantive due

process violation as well as a procedural due process violation.  The substantive

due process clause protects against "government interference with certain

_____

[9]Contrary to Plaintiff's contention, this Court concludes that the six-years'
requirement for a candidate to complete his or her dissertation and Ph.D. were
applicable to him.  The General Guidelines "effective for all students entering after
2001"– which expressly include the deadline– do provide that "[s]tudents who
began their work earlier [such as Plaintiff] may elect to be governed by these
guidelines or by those that were in effect at the time of their admission[]." (Pl.'s
Aff., Ex. 13.)  Nevertheless, there is no genuine dispute that the General Guidelines
in effect at the time of Plaintiff's admission– which state only an expectation of
program completion in four to six years– were modified to include the six-years'
requirement by faculty vote at its December 14, 2000 meeting (as set forth in Dr.
Goldenberg's memo).  (Defs.' Mot. Ex. C.)

fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 2267 (1997). "The interests protected by substantive due process are . . . much narrower than those protected by procedural due process." *Bell v. Ohio State Univ.*, 351 F.3d 240, 249-50 (6th Cir. 2003). The Sixth Circuit has definitively held that, absent an equal protection violation, a graduate student's interest in continuing his or her education is not protected by substantive due process. *Id*. at 251; *see also Rogers v. Tennessee Bd. of Regents*, 273 F. App'x 458, 463 (6th Cir. 2008); *McGhee*, 167 F. App'x at 436-37. As discussed later, Plaintiff presents no evidence to support an equal protection violation.

Accordingly, the Court concludes that Defendants are entitled to summary judgment with respect to Plaintiff's federal and state due process claims (Counts 2 and 5).

### 3.    First Amendment Retaliation[10]

In his first claim for relief, Plaintiff asserts that he was retaliated against in violation of his First Amendment rights. To prevail on this claim, he must show

---

[10]"The rights of free speech under the Michigan and federal constitutions are coterminous." *In re Contempt of Dudzinski*, 257 Mich. App. 96, 100, 667 N.W.2d 68, 72 Mich. App. (2003) (citing *Woodland v. Michigan Citizens Lobby*, 423 Mich. 188, 202, 378 N.W.2d 337 (1985)).

that (1) he engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between his conduct and the adverse action. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Plaintiff's Complaint only vaguely identifies his protected conduct. (*See* Compl. ¶ 86, alleging that "Plaintiff exercised his right to free speech through his academic work, discussions with faculty and staff at the University, and with his fellow students"). He alleges no facts, and none are presented in the record, to establish a connection between this conduct and the decision to dismiss him for failure to complete his dissertation and Ph.D. within six years.

Defendants therefore are entitled to summary judgment with respect to Plaintiff's claims alleging retaliation in response to his free speech rights under the federal and state constitutions (Counts 1 and 4).

### 4.   Equal Protection[11]

Plaintiff also alleges an equal protection claim under § 1983. Plaintiff explained during his deposition in this case that this claim is based upon

---

[11]The Michigan Supreme Court has held that the rights provided under the Equal Protection Clause of the Michigan Constitution are coextensive with those provided under the United States Constitution. *Umani v. Michigan Dep't of Corr.*, 432 F. App'x 453, 458 n.2 (6th Cir. 2011) (citing *Armco Steel Corp. v. Dep't of Treasury, Corp. Fanchise Fee Div.*, 419 Mich. 582, 358 N.W.2d 839, 842 (1984).

28

Defendants' conduct relative to the dissertation process rather than his dismissal. (*See* Defs.' Mot. Ex. G at 116-120.)  As such, it is time-barred.  To the extent Plaintiff in fact believes that he was treated differently than similarly situated individuals with respect to his dismissal, there is no evidence in the record to support his belief. (*See id*. at 153, 161.)

Defendants therefore are also entitled to summary judgment with respect to the third and sixth counts of Plaintiff's Complaint.

### D.     Breach of Contract

Plaintiff asserts that the General Guidelines created an express contract between himself and UofM.  (Pl.'s Resp. Br. at 10.)  Plaintiff also asserts that he had an implied contractual right to continued graduate school enrollment free from arbitrary dismissal, citing *Board of Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 106 S. Ct. 507 (1985).  (Pl.'s Resp. Br. at 11.)  As to his first assertion, even if the General Guidelines constituted an express contract (which the Court believes they did not, *see Cuddihy v. Wayne State Univ. Bd. of Governors*, 163 Mich. App. 153, 156-68, 413 N.W.2d 692 (1987)), Plaintiff fails to identify any promise therein that was breached as a result of his dismissal (as opposed to the time-barred conduct of Defendants related to the dissertation process).

Plaintiff can prevail on his implied contract theory of liability only if he can

29

show that the decision to dismiss him was arbitrary. *See Booker v. Grand Rapids Med. Coll.*, 156 Mich. 95, 99-100, 120 N.W. 589, 590 (1909) (declaring that "when one is admitted to a college, there is an implied understanding that he shall not be arbitrarily dismissed therefrom"); *Carlton v. Trustees of Univ. of Detroit Mercy*, No. 225926, 2002 WL 533885, at *3 (Mich. Ct. App. 2002) (finding that "a student who has been accepted to a university has an implied contractual right to continued enrollment" which "gives the student the right to continued enrollment free from arbitrary dismissal"). When deciding whether an academic decision was arbitrarily made, the Supreme Court has cautioned judges to "show great respect for the faculty's professional judgment." *See Ewing*, 474 U.S. at 225, 106 S. Ct. at 513. The *Ewing* Court further cautioned judges to override such decisions only where they reflect "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id*.

The evidence shows that, prior to dismissing Plaintiff, Dr. Goldenberg received feedback from the members of his dissertation committee regarding the quality of his draft dissertation and the likelihood of revising it to make it defense-

ready.[12]  The Department of Political Science had a policy in place since December

2000, requiring doctoral students to successfully defend their dissertation and

thereby complete the Ph.D. program within six years of achieving candidacy.  Dr.

Goldenberg dismissed Plaintiff based on his undisputed failure to comply with this

requirement.  Plaintiff fails to convince the Court that this decision reflects "a

substantial departure from accepted academic norms" and that Dr. Goldenberg was

"not actually exercis[ing her] professional judgment."

Defendants therefore are entitled to summary judgment with respect to

Plaintiff's breach of contract claim.

## VII.  Conclusion

In summary, due to Plaintiff's failure to present any evidence to counter

Defendants' well-supported motion, the Court finds that Defendants are entitled to

summary judgment with respect to Plaintiff's tortious interference (Count 9),

intentional infliction of emotional distress (Count 10), and race discrimination

(Count 11) claims, and all of his claims alleging state and federal constitutional

violations by the Regents,.  Plaintiff also has not presented evidence suggesting

that Drs. Herzog, Whitman, or Kirkland were responsible and therefore liable for

---

[12]In fact well before Plaintiff was dismissed, Dr. Goldenberg was blind carbon copied on several e-mails between Plaintiff and committee members where the latter's criticisms of Plaintiff's work were stated.  (*See, e.g.*, Pl.'s Aff., Ex. 9.)

the dismissal decision (as he is barred by the applicable statutes of limitations from premising their liability on their involvement in the dissertation process).  Plaintiff also has not demonstrated a genuine issue of material fact with respect to his claims alleging violations of the federal and state constitutions (Counts 1-6) and breach of contract claim (Count 7); and based on the facts presented, the Court holds that Defendants are entitled to judgment as a matter of law on those claims.

Accordingly,

**IT IS ORDERED**, that Defendants' motion for summary judgment is **GRANTED**.

Dated: September 30, 2013                s/PATRICK J. DUGGAN
                                         UNITED STATES DISTRICT JUDGE


Copies to:
Joseph Dean Vigil
2850 South Hobart Way
Denver, CO 80227

Donica Thomas Varner, Esq.